IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 13-20134-01-CM |
| | ) |
| **WEIQIANG ZHANG**, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S RESPONSE TO
DEFENDANT'S SENTENCING MEMORANDUM**

The United States, through its undersigned counsel, submits this response to defendant Weiqiang Zhang's sentencing memorandum (doc. 249).  For the reasons herein and in the government's Memorandum on Sentencing (doc. 250), a sentence of 151 months of imprisonment for defendant Zhang, at the low end of the guidelines range as calculated by the Presentence Investigation Report (PSR) (doc. 245), is appropriate and reasonable.

**A.  The Evidence Indicates That Zhang Intended To Cause More Than $25 Million of Loss to Ventria.**

The evidence contains ample facts to conclude that Zhang purposely sought to cause more than $25 million in loss to Ventria.  In fact, all Ventria employees realized the catastrophic effect that a theft like Zhang's—in which some of the company's most valuable assets were stolen for foreign exploitation—would have on the company, and it strains credulity to believe that an employee engaged in such a betrayal without intending to inflict very significant harm on Ventria.

Under U.S.S.G. § 2B1.1, "'intended loss' means a loss the defendant *purposely* sought to inflict.  'Intended loss' does not mean a loss that the defendant merely *knew* would result from

1

his scheme or a loss he might have *possibly and potentially* contemplated." *United States v. Manatau*, 647 F.3d 1048, 1050 (10th Cir. 2011).  Proof of a defendant's "purpose" can and should include "reasonable inferences about the defendant's mental state from the available facts. . . . [Such proof at sentencing requires only] a preponderance of the evidence, and the court need only make a 'reasonable estimate' of the intended loss." *Id.* at 1056.  Moreover, "'intended loss' can be shown by looking to what loss was '*expected*' because . . . a person is presumed to have 'intended the natural and probable consequences of his or her actions.' *Id.* at 1055 (emphasis added) (*quoting United States v. McCoy,* 508 F.3d 74, 79 & n. 6 (1st Cir. 2007) (internal quotation omitted)); *see also United States v. Killen*, 761 F.3d 945, 950 (8th Cir. 2014) (noting *Manatau*'s endorsement of considering expected loss).

Additionally, intended loss is measured as the "pecuniary harm that the defendant purposely sought to inflict; and [ ] includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)."  U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)).  The Guidelines also provide a non-exhaustive list of factors that can be used to estimate the loss amount.  *See id*. § 2B1.1, comment. (n.3(C)).

Because trade secrets are so difficult to assign a specific dollar value to, the Guidelines were amended in November 2009 to include Application Note 3(C)(ii).  "In the case of proprietary information (*e.g.*, trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense" is to be considered in estimating the loss amount.  *Id*. § 2B1.1, comment. (n.3(C)(ii)).  The amendment made explicit what several courts had already done, namely, to consider the research and development costs as an alternative measure of the loss amount in a trade secret case.  *See, e.g., United States v. Ameri*,

412 F.3d 893, 900 (8th Cir. 2005); *United States v. Four Pillars Enterprise Company*, 253 Fed.

Appx. 502, 512 (6th Cir. 2007) (unpublished opinion); *United States v. Wilson*, 900 F.2d 1350,

1355-56 (9th Cir. 1990).  Regardless of the method or the various factors employed to calculate

loss, it must be a "reasonable estimate of the loss."  U.S.S.G. § 2B1.1, comment. (n.3(C)).

Trial testimony established that Ventria team members knew that the company had

poured tens of millions of dollars and years of research into developing its seeds and its methods

for getting the most protein out of those seeds.  Zhang had particularly-detailed knowledge about

the breeding and cultivation portions of that work, as they were his personal responsibility.  And

every Ventria employee knew that seed security was a paramount concern for the company.

These facts, taken together with the evidence that showed Zhang's loyalty was with Tianjin Crop

Research Institute (TCRI) and not with Ventria, show that Zhang *expected*, and therefore

*intended*, to cause Ventria harm in the tens of millions of dollars.  Taking into account the

development costs of the seeds and the breeding and cultivation methods, $25 million or more is

a reasonable estimate of the loss Zhang intended.

The evidence of intent to cause loss here is far more convincing than in *Manatau*.  In

*Manatau*, the Court of Appeals found that the district court "simply tot[ed] up credit limits" on

the stolen convenience checks "without any finding that the defendant intended to inflict a loss

reasonably approaching those limits."  *Manatau*, 647 F.3d at 1057.  Here, the development cost

of the information at issue (*i.e.*, one measure of the *possible* loss) is not the sole indicator of

intended loss, but rather a factor that the court should use in coming to a reasonable estimate of

the intended loss.

Testimony during the trial established the investment by Ventria in the seed technology

that wholly involves and incorporates the trade secrets was at least $55 million.  In addition to

that method for determining a reasonable estimate of intended loss, the trial testimony also revealed Ventria incurred an additional $3-$18 million in expenses developing each of their unique seed lines.  A third method for determining the reasonable estimate of intended loss is the future lost profits for the recombinant proteins produced by Ventria.  The trial testimony for that alternative method supported an intended loss amount well above the highest dollar loss amount in U.S.S.G. § 2B1.1(b)(1).  Thus, intended loss in excess of $25 million is supported by the trial testimony and is a completely reasonable estimate of intended loss.

There is additional evidence that Zhang intended to cause very significant harm to Ventria, namely, his October 17, 2010 letter to TCRI.  Zhang writes he aspires to return to TCRI "and selflessly offer up everything I have learned.  I am also always thinking of ways to do everything in my power under current conditions for our institute's [TCRI's] research on rice and other crops."  Govt. Trial Ex. 55.  After having identified his science background and noting "the fatherland has remained in my heart," Zhang concluded with this paragraph:

> Value maximization is only possible if scientific research is converted into production.  The research, development, and utilization of rice products is not limited to rice seeds and commercial grain.  Rice seeds can be used as a carrier and inserted into a foreign gene to develop protein products.  Leading research can be launched on using cereal and grain seeds to produce enzymes (proteins) for industrial, medical, health, and functional make-up purposes.  Recombinant proteins can be used to develop commercial products.  In terms of the amount of land used for office space, industrial protein products are 500 times more profitable than commercial grain using the same land area.  The company I work for is the only US biotech company that has produced and sold these recombinant protein products made from rice seeds.  I hope that our Tianjin, China can achieve this same level of biology R&D in the near future.

*Id*.

Zhang clearly recognized the value of his research at Ventria, and that its real worth was incorporating the science into products, which he helped Ventria accomplish.  Zhang knew the value of land in China used for office space and commercial grain and opined that the technology

4

he learned from Ventria and provided to TCRI and China was "500 times more profitable." Zhang's letter shows that he recognized the significant dollar value and profit from Ventria's endeavors, and his words reveal his actual knowledge of the great loss he was causing to Ventria by stealing their seeds and the inherent value from the proprietary and trade-secret-protected research and development process.

A final point on the relevance of development costs to the loss estimate: As Ventria witnesses testified at trial, Ventria's intellectual property protection strategy included both trade secrets and patents. The jury found that Zhang conspired to steal trade secrets, and that he was also guilty of interstate transportation of stolen property (the seeds) and conspiracy to commit same. Zhang argues that for sentencing purposes, the court must carve the value of the trade secrets apart from the value of the patented information. In fact, no such surgery is necessary. Zhang's theft likely did include patented information along with trade secret information. However, the value of any patented information is properly considered at sentencing as either relevant conduct, pursuant to U.S.S.G. § 1B1.3, or included in the value of the stolen property that was transported across state lines (Ventria's treasured seeds). The trial testimony explained that the seeds themselves are the product of patents—that is, the laboratory, small-scale research and development—and trade secrets, which enable Ventria to produce their recombinant proteins on a commercial scale with additional research and development. Each seed is a factory for others, so a competitor with any stolen seeds saves tens of millions of dollars in laboratory and commercial costs, particularly if the "competitor" is operating at a similar latitude and within a similar climate as Ventria.

In accordance with 10th Circuit precedent, the court should conclude that Zhang intended to cause tens of millions of dollars in loss to Ventria, and that an amount in excess of $25 million is a reasonable estimate of that intended loss.

**B. Zhang's Position of Trust at Ventria Justifies a Two-Level Enhancement.**

Zhang's trial was replete with evidence about the position of trust that Zhang held within Ventria, and it was that trust that enabled him to commit his crimes. Because of that trust and the role it played in Zhang's ability to commit and conceal his crimes, a two-level enhancement is appropriate under U.S.S.G. § 3B1.3.

"The primary concern of § 3B1.3 is to penalize defendants who take advantage of a position that provides them freedom to commit or conceal a difficult-to-detect wrong." *United States v. Chee*, 514 F.3d 1106, 1118 (10th Cir. 2008) (*quoting United States v. Koehn*, 74 F.3d 199, 201 (10th Cir. 1996)). Application note 1 to § 3B1.3 explains that the enhancement "refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3, comment. (n.1). Application of § 3B1.1 includes two inquiries: "(1) whether the person occupies a position of trust, and (2) whether the position of trust was used to facilitate significantly the commission or concealment of the crime." *United States v. Spear*, 491 F.3d 1150, 1153 (10th Cir. 2007). The first inquiry "has little to do with *trustworthiness* and everything to do with *authority* and *discretion*." *Id.* at 1154. Mere "[o]pportunity and access do not equate to authority, or to the kind of 'substantial discretionary judgment that is ordinarily given considerable deference.'"

*United States v. Edwards*, 325 F.3d 1184, 1187 (10th Cir. 2003) (quoting U.S.S.G. § 3B1.3 comment. (n.1)).

Zhang certainly held a position of trust within Ventria, which entailed unfettered access and opportunity, including being one of the few employees with full access across Ventria's Junction City facilities, and being one of only six employees with access to the master seed vault. This rarefied level of access indicated that Zhang was among the few Junction City employees granted a high level of discretion and deference. Testimony at trial also indicated that Zhang had very little supervision; he worked largely on his own in his capacity as a rice breeder, using his Ph.D.-level expertise to best develop the rice plants that were the lifeblood of Ventria's business. Indeed, it was this expertise in rice breeding that led Ventria to place so much trust in Zhang; the company concluded that the access afforded Zhang was necessary in order for him to be able to employ his expertise.

Zhang's employment offer included two pages that described his "Roles & Expectations" as a rice breeder. *See* Govt. Trial Ex. 80. Of note, this required Zhang to do the following: 1) "manag[e] a successful breeding program"; 2) "[m]anage a successful seed production program"; 3) "[p]articipat[e] in filing desired permit applications"; 4) "[e]nsure operational compliance of all regulations and permit conditions"; 5) "[e]nsure good agricultural practice"; 6) "[e]ducate employees with all related regulation and ensure full compliance"; 7) "[be] [c]apable to conduct multi-location yield trials"; 8) "[m]anage breeding station operation budget"; 9) "[s]tart establishing breeding station in KS including ware house space and . . . acres of land"; 10) "[h]elp to find out, establish and maintain a winter nursery"; 11) "[e]stablish test plots to evaluate recurrent parental lines"; 12) "evaluate field performance in growing location"; and 13) "[m]aintain . . . panicles rows, . . . breeder seeds and . . . foundation seeds for all the production

varieties and developing varieties." *Id.* Trial testimony from Ventria employees matched Zhang's work as a rice breeder at Ventria with these "Roles & Expectations."

Zhang was clearly afforded far more responsibility and deference than a bank teller or a hotel clerk. *See* U.S.S.G. § 3B1.3, comment. (n.1) (enhancement does not cover, for example, bank tellers or hotel clerks). And while Zhang wasn't an executive at Ventria, his expertise, and the responsibility and unfettered access that it afforded him, makes a § 3B1.3 enhancement appropriate here. Under *Spear*, Zhang (1) held a sufficient position of trust and (2) used that position of trust, and the access and deference that came with it, to commit his crimes and avoid detection. Accordingly, a two-level enhancement for abuse of trust is warranted.

### C. Zhang's Subjective Intent to Benefit China and TCRI Justifies a Four-Level Enhancement.

Evidence at trial established that Zhang maintained loyalties to both China and TCRI during his employment with Ventria. Zhang sought to benefit not only TCRI, but also China in general. That evidence justifies a four-level enhancement for intent to benefit a foreign government or instrumentality pursuant to U.S.S.G. § 2B1.1(b)(13)(B).

Section 2B1.1(b)(13)(B) calls for a four-level enhancement if the defendant "knew or intended . . . that the offense would benefit a foreign government, foreign instrumentality, or foreign agent." U.S.S.G. § 2B1.1(b)(13)(B). The terms "foreign instrumentality" and "foreign agent" have the same definitions as in 18 U.S.C. § 1839, passed as part of the Economic Espionage Act of 1996 (EEA). A "foreign instrumentality" is "any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government." 18 U.S.C. § 1839(1). A "foreign agent" is

"any officer, employee, proxy, servant, delegate, or representative of a foreign government."  18

U.S.C. § 1839(2).

The "benefit" to the foreign entity should be interpreted broadly.  As the House Report on

the EEA clarified:

> The defendant did not have to intend to confer an economic benefit to the foreign government, instrumentality, or agent, to himself, or to any third person. Rather, the government need only prove that the actor intended that his actions in copying or otherwise controlling the trade secret would benefit the foreign government, instrumentality, or agent in any way.  Therefore, in this circumstance, benefit means not only an economic benefit but also reputational, strategic, or tactical benefit.

H.R. Rep. No. 104-788, at 11 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4021, 4030.

Zhang's 2010 letter to TCRI clearly demonstrated his intent, a clear intent not often

found in other cases.  In the letter dated two years after he started working at Ventria, Zhang

wrote that "Even though I am abroad, the fatherland [China] has remained in my heart.  It is an

aspiration of mine to one day return to [TCRI] and selflessly offer up everything I have learned."

PSR ¶25; Govt. Trial Ex. 55.  When he provided Ventria's proprietary seeds and information to

TCRI delegates in 2013, Zhang was acting on this intent to benefit both TCRI and China.

Before the TCRI delegation traveled to Iowa State University, Zhang provided

background information about the Institute to an Iowa State professor in an email.  That

information revealed TCRI was established in 1979, and is part of the Tianjin Academy of

Agricultural Sciences.  TCRI includes a plant hereditary and breeding key laboratory with

hundreds of acres of land in Tianjin and the surrounding area.  TCRI operates experimental

fields, cool seed storage rooms, ambient seed storage rooms, seed drying rooms, and grain

processing rooms.  *See* Govt. Trial Ex. 64.

Section 2B1.1(b)(13)(B)'s enhancement for intent to benefit a foreign government is met here; Zhang intended to benefit China.  However, the Court could also conclude that Zhang intended to benefit TCRI as an instrumentality of China.  Zhang argues that the legislative history of the EEA indicates that Congress was concerned only with instrumentalities of central foreign governments, not subdivisions of foreign governments (such as the municipal government of Tianjin, China).  This seems unlikely.  Moreover, Senators Spector and Kohl, as managers of the EEA, submitted a statement that indicates that foreign subdivisions were a concern, citing their "understanding of the definition of 'foreign instrumentality'' which indicates that a foreign organization must be 'substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government *or subdivision thereof*.'"  142 Cong. Rec. 12211 (daily ed. Oct. 2, 1996) (emphasis added).

Accordingly, the four-level enhancement pursuant to § 2B1.1(b)(13)(B) is justified either by Zhang's intent to benefit China generally, or by his intent to benefit TCRI specifically.

### D.  The 2016 Guidelines Manual Should Apply.

As recommended by the PSR, the 2016 edition of the Guidelines Manual should apply because Zhang's criminal conduct continued until the FBI seized Ventria's seeds from Zhang's house in December 2013, and the 2016 Guidelines are more favorable to Zhang than the 2013 Guidelines.  *See* PSR ¶201.  The PSR adequately explains its reasons for concluding that the 2016 Guidelines are appropriate here.  *See* PSR ¶¶199-203.  The main question is whether the conspiracy lasted until December 2013, *see* PSR ¶200, and there are good reasons to conclude that it did.

The government still does not know the extent of the conspiracy between Zhang and individuals at TCRI.  Ventria's seeds were seized from the TCRI delegation leaving Hawaii in

10

August 2013, but there is no evidence that the conspiracy ended there, nor is there evidence that Zhang did not still have the intent, and the means, to cause harm to Ventria.  After authorities seized Ventria's seeds from the TCRI delegation, Zhang did not cut his ties with TCRI.  Nor did he come clean with Ventria about his role in the theft.  Zhang still possessed valuable Ventria seeds in his house until the FBI seized them in December 2013.  Incredibly, even as he was being arrested, Zhang denied even knowing anything about human serum albumin (HSA) and lactoferrin (LF) until he was confronted with the fact that Ventria's seeds had been found in his house.  Of particular note, Zhang had additional strains of Ventria protein seeds secreted in his home beyond HSA and LF, which further supports the conclusion that the conspiratorial agreement persisted past the Hawaii seizure.

Until the seizure at his house, Zhang still had the motive (to benefit TCRI at Ventria's expense) and the means (Ventria seeds in his personal possession, contrary to Ventria policy) to harm Ventria.  The Court should find, by a preponderance of the evidence, that the conspiracy continued to December 2013, and that the 2016 Guidelines are therefore appropriate for the reasons stated in the PSR.

**E.  This Case Does Not Call For a Downward Variance.**

"Our single greatest asset is the innovation and the ingenuity and creativity of the American people.  It is essential to our prosperity and it will only become more so in this century."  https://obamawhitehouse.archives.gov/the-press-office/remarks-president-export-import-banks-annual-conference (March 11, 2010).  Likewise, "[t]rade secrets are an integral part of virtually every sector of our economy and are essential to maintaining the health and competitiveness of critical industries operating in the United States.  Economic espionage and trade secret theft threaten our Nation's national security and economic well-being."  *See* Presidential Statement on Signing the Economic Espionage Act of 1996, 2 Pub. Papers 1814-15,

1996 WL 584924 (Oct. 11, 1996). "The development and production of proprietary economic information is an integral part of U.S. business and is thus essential to preserving the competitiveness of the U.S. economy." S. Hrg. 104-499, at 2, 1996 WL 90824 (Feb. 28, 1996) (opening statement of Sen. Arlen Specter). "A piece of information can be as valuable to a business as in fact a factory is. The theft of that information could do more harm than if an arsonist torched that factory." *Id.* at 3, 1996 WL 90789 (Feb. 28, 1996) (opening statement of Sen. Herb Kohl). In considering whether to pass the Economic Espionage Act, Congress found that "[o]nly by adopting a national scheme to protect U.S. proprietary economic information can we hope to maintain our industrial and economic edge and thus safeguard our national security." S. Rep. 104-359, 11-12, 1996 WL 497065 (July 30, 1996); *see also* H.R. Rep. 104-788, reprinted in 1996 U.S.C.C.A.N. 4021, 4025 (Sept. 16, 1996) (finding that a "comprehensive federal criminal statute" "will serve as a powerful deterrent to this type of crime" and would "better facilitate the investigation and prosecution of [trade secret theft]").

This case does not call for a downward variance from the applicable guidelines range. The guidelines range calls for a severe sentence, to be sure, but Zhang committed serious crimes which, had his scheme been successful, threatened disastrous consequences for the Ventria team that had placed so much trust in him. A severe sentence would also not be out of line with other cases involving thefts or attempted thefts of particularly valuable trade secrets:

- Employees of Coca Cola sentenced to 96 and 60 months of imprisonment for conspiring to steal trade secrets from their employer, with the sentencing judge finding intended loss of $1.5 million (above-guidelines variances). *See United States v. Williams*, 526 F.3d 1312, 1321 n.2 (11th Cir. 2008) (affirming conviction and sentence).

- Employee sentenced to 96 months of imprisonment for stealing trade secrets (computer code) from his employer, with sentencing judge finding actual loss of $1.4 million. *See United States v. Ameri*, 412 F.3d 893, 899-901 (8th Cir. 2005) (affirming conviction and sentence), *cert. denied*, 546 U.S. 1206 (2006).

- Defendant sentenced to 87 months of imprisonment after pleading guilty to trade secret theft and economic espionage; stipulated value of stolen trade secrets was between $7 million and $20 million.  *See United States v. Huang* (S.D. Ind. No. 10-cr-0102, D. Minn. 11-cr-00163) (Dec. 21, 2011).

- Defendant sentenced to 77 months of imprisonment for conspiring to steal trade secrets from Intel.  *See United States v. Hallstead* (E.D. Tex. No. 98-41570) (Dec. 15, 1998); *United States v. Hallstead*, 189 F.3d 468 (5th Cir. 1999) (*per curiam*) (affirming conviction and sentence), *cert. denied*, 529 U.S. 1079 (2000).

- Employee sentenced to 70 months of imprisonment after pleading guilty to stealing trade secrets from his employer; stipulated value of trade secrets exceeded $50 million.  *See United States v. Yu* (E.D. Mich. No. 09-20304) (Apr. 12, 2011).

Accordingly, a sentence within the advisory guidelines range, while severe, is appropriate in this case.

## CONCLUSION

For the reasons stated above, in the government's Memorandum on Sentencing (doc. 250), and in the PSR, the Court should impose a sentence of 151 months of imprisonment.

Respectfully submitted,

STEPHEN R. MCALLISTER
United States Attorney


s/ Scott C. Rask
SCOTT C. RASK, #15643
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, Kansas  66101
(913) 551-6730
(913) 551-6541 (fax)
Scott.Rask@usdoj.gov


s/ Matthew R. Walczewski
MATTHEW R. WALCZEWSKI
Trial Attorney

13

National Security Division
United States Department of Justice
600 E Street NW
Washington, D.C.  20530
(202) 233-0986
(202) 233-2147 (fax)
Matthew.walczewski@usdoj.gov
Ill. Bar No. 6297873

s/ Brian J. Resler
BRIAN J. RESLER
Trial Attorney
Computer Crime and Intellectual
Property Section
United States Department of Justice
1301 New York Avenue N.W.
Sixth Floor
Washington, D.C.  20005
(202) 616-3298
(202) 305-1744 (fax)
Brian.resler2@usdoj.gov
Wis. Bar No. 1023837

CERTIFICATE OF SERVICE

I certify that on March 28, 2018, I electronically filed this Responsive Sentencing

Memorandum with the clerk of the court by using the CM/ECF system, which will send a notice

of electronic filing to the following:

Thomas W. Bartee
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas  66101
(913) 551-6712
(913) 551-6562 (fax)
Tom_bartee@fd.org
Attorney for defendant

David M. Magariel
Assistant Federal Public Defender
500 State Avenue, Suite 201
Kansas City, Kansas  66101
(913) 551-6712

14

(913) 551-6562 (fax)
David_magariel@fd.org
Attorney for defendant

 s/ Scott C. Rask
SCOTT C. RASK, #15643
Assistant United States Attorney